Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Jeffrey E. Sandberg (pro hac vice forthcoming)
Kuntal V. Cholera (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
jsandberg@cov.com
kcholera@cov.com
*[Additional counsel on signature page]*

*Attorneys for Plaintiff Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| META PLATFORMS, INC.,<br>Plaintiff,<br>v.<br>ROB BONTA, in his official capacity as Attorney General of California,<br>Defendant. | Case No.: ______________________<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. The First Amendment protects the editorial judgments of those who curate, display, and disseminate speech—whether newspapers, parade organizers, or social media platforms. California Assembly Bill 1709 (the "Act" or "AB 1709") is California's latest attempt to flout that fundamental principle and appoint the State as the editor, curator, and controller of online speech.

2. AB 1709 compels social media services like those operated by Plaintiff Meta Platforms, Inc. ("Meta") to adopt the State's preferred methods of organizing, curating, and presenting content to users under the age of sixteen ("minors").[1] Specifically, the Act prohibits Meta from considering minor users' personal interests when organizing billions of posts across its Facebook, Instagram, and Threads services and also prohibits letting minors view content on "autoplay," meaning that Meta must force minors to affirmatively confirm that they want to view expressive content before it can be displayed. *See* §§ 22682(a), 22683, 22684(b). And because Meta currently organizes its feeds of content to include personalized content recommendations and to automatically play media, the Act would make it unlawful for Meta to disseminate speech to minors altogether, and would require Meta to delete minors' accounts, unless it changes these practices. *See* §§ 22683, 22684(b).

3. As applied to Meta's Facebook, Instagram, and Threads services, the Act's personalized-feed ban and autoplay ban violate the First Amendment.[2] Meta's services collectively enable billions of people around the world to share ideas, offer support, discuss important topics—and, subject to Meta's content moderation policies, "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Id.* at 105 (quotation omitted). The State cannot,

---

[1] Because the Act's restrictions largely apply to users under sixteen, Meta uses the term "minor" to refer to users under the age of sixteen. When discussing the Act's requirements, this Complaint uses "teen," "minor," "adult," and "user" to refer only to persons residing in California. § 22682(f). Unless otherwise noted, statutory citations in this Complaint refer to the California Business and Professions Code.

[2] Meta uses the term "personalized feed" rather than the Act's pejorative "addictive feed," which is defined at § 22682(b). Meta uses the term "personalized-feed ban" to refer to the Act's prohibition on providing a personalized feed to a minor. §§ 22682(a)(1), 22683.

consistent with the First Amendment, override Meta's editorial judgments about how to curate and display these billions of posts of third-party speech. That the Act implements both bans by a direct prohibition on providing the features to minors, § 22683, and by requiring Meta to delete minors' accounts if the features are not banned, § 22684(b), makes no constitutional difference. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77–78 (1990).

4. As Supreme Court precedent confirms, the feeds of third-party content that Meta makes available on its Facebook, Instagram, and Threads services "receive First Amendment protection" because they are the product of Meta's "expressive choices" in deciding which kinds of user-generated "content [its] feeds will display, or how the display will be ordered and organized." *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024). The First Amendment "does not go on leave when social media are involved." *Id.* at 719. Rather, like the "editorial choices" made by "[t]raditional publishers," Meta's choices about what third-party content its feeds will display, and when and how to display it, "receive First Amendment protection." *Id.* at 717, 740. As a result, laws like AB 1709 that purport to dictate how Meta may "organize, prioritize, or disclaim posts in its" feeds, and how Meta can "display" those posts, burden "exactly the kind of editorial judgments [that] receive First Amendment protection." *Id.* at 718.

5. Even apart from its interference with editorial discretion, AB 1709 implicates the First Amendment because it burdens Meta's right to disseminate third-party speech on its services. The feeds' contents are undisputedly protected third-party speech, and AB 1709 regulates Meta's dissemination of that speech. Therefore, the personalized-feed ban burdens Meta's independent First Amendment right to "mak[e] protected materials available to the public." *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568 (9th Cir. 1984).

6. Equally, the autoplay ban—by forcing Meta to make users take affirmative action before Meta can display expression—infringes Meta's right to engage in the "*free and unhampered* distribution of" speech. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 154 (2002) (emphasis in original); *see also, e.g.*, *Doe v. Harris*, 772 F.3d 563, 573 (9th Cir. 2014) (First Amendment required invalidating similar law that "impose[d] an impermissible 'affirmative obligation'" on recipient

before speech could be disseminated to them (quoting *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965))).

7. The Act's bans on personalized feeds and autoplay cannot survive First Amendment review. Strict scrutiny applies because AB 1709 imposes both content-based and speaker-based restrictions on speech. But the Act would fail intermediate scrutiny too. The only possible interest the State could articulate in controlling Meta's editorial judgment and hampering its dissemination of protected speech is that the State seeks to suppress speech, which the First Amendment does not permit.

8. The Act's bans are also overinclusive, applying to all minors regardless of how long they are online and regardless of their circumstances. And they are not tailored to their purported purpose—addressing alleged psychological harms from excessive time online—because they target editorial processes with no demonstrated connection to those harms while leaving minors free to spend unlimited time elsewhere on the internet, including on other services that present personalized content recommendations and play audio or video content automatically. Moreover, the State cannot demonstrate why the Act's bans are needed on services like Meta's, which will soon default minors to a cumulative two-hour time limit on Facebook and Instagram that only parents or guardians can override, and that will provide minors and their parents with options to make their default feed non-personalized and to disable the automatic playing of audiovisual content.

9. As applied to Meta's Facebook, Instagram, and Threads services, the Act's personalized-feed ban and autoplay ban are also preempted by Section 230. The Ninth Circuit has held that Section 230 preempts state laws that "attack the manner in which Facebook's algorithm sorts, arranges, and distributes third-party content"—which is precisely what the personalized-feed ban attempts to do. *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 646 (9th Cir. 2025); *see also, e.g.*, *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1169–70 (9th Cir. 2026) (Section 230 bars claims that would impose liability on Meta based on "promotion of engagement-driven [third-party] content through [a] recommendation algorithm," including "a personalized algorithm").

10. Likewise, Section 230 preempts state laws that would "hold internet content providers liable for developing 'content-neutral tools used to facilitate [users'] communications,'" such as Meta's tools that automatically play user-generated audiovisual content for other users. *Doe 1 v. Twitter*, 148

F.4th at 646 (quoting *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019)); *see In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 831 n.16 (N.D. Cal. 2023) (claims premised on Meta's "auto-play" features contravene Section 230). By prohibiting Meta from facilitating user-to-user communication through these design features, the Act seeks to impose precisely the kind of liability for publishing decisions that Section 230 forbids.

11. The Act's requirement to delete minors' accounts unless these features are banned, § 22684(b), is independently preempted by Section 230. "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc). By mandating that Meta remove third-party content—users' accounts—AB 1709 again contravenes Section 230. *See Shared P'ship v. Meta Platforms, Inc.*, ___ F.4th ___, 2026 WL 3266791, at *4 (9th Cir. 2026) (whether to delete a user's account page is an exercise of Meta's "publishing prerogative" and a "quintessential editorial decision protected under Section 230"); *NetChoice v. Bonta* ("*Bonta*"), 790 F. Supp. 3d 798, 809 (N.D. Cal. 2025) (Section 230 preempted California statutory requirement to delete certain user accounts).

12. For these reasons and more, the Court should declare the challenged provisions in AB 1709 invalid as applied to Meta's Facebook, Instagram, and Threads services and enjoin Defendant from enforcing them against Meta.

## PARTIES & STANDING

13. Plaintiff Meta Platforms, Inc. ("Meta") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Menlo Park, California. Meta's mission is to build the future of human connection and the technology that makes it possible.[3]

14. Meta's Facebook, Instagram, and Threads services are covered by AB 1709 because each of these services: (1) constitutes "an internet website, online service, online application, or mobile application" that (2) "offers users or provides users with" at least one of AB 1709's targeted "features" as

---

[3] *Company Information*, Meta, https://about.meta.com/company-info/ (last visited Nov. 3, 2026) [hereinafter Company Information].

"a significant part of the service." § 22682(c)(1). In particular, a significant part of all three services is their "feed[s]" of content that include personalized content recommendations—*i.e.*, "multiple pieces of media generated or shared by users [that] are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user" or the user's device. § 22682(b). These feeds of content on Meta's services do not qualify under the Act's exclusion criteria set forth at § 22682(b)(1)–(7). Further, Facebook, Instagram, and Threads do not fall in the Act's exclusion criteria set forth at § 22682(c)(2), as these services are not limited to commercial transactions or consumer reviews and they are not operated for the primary purpose of cloud storage.

15. Meta currently provides feeds that include personalized content recommendations on its Facebook, Instagram, and Threads services for all of its users, adults and minors alike. And Meta automatically plays some video and audio content on these services. Meta neither desires to nor intends to change its services to ban these practices for minors without regard to their (and their parents') individual choices and preferences, as the Act would require.

16. Meta has standing to bring its challenge because it has an actual and well-founded fear that Defendant will initiate enforcement proceedings against Meta unless Meta bans personalized feeds and "autoplay" for minors on Facebook, Instagram, and Threads, § 22683, or alternatively bans minors from its services altogether, § 22684(b). Unless §§ 22683 and 22684(b) are enjoined, these mandates would interfere with and burden Meta's constitutionally and statutorily protected expressive curatorial and editorial activity, as well as its constitutionally and statutorily protected publication and dissemination of user-generated speech. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163, 167–68 (2014) (discussing First Amendment injury of "forcing [a plaintiff] to choose between refraining from [protected] speech [activity] on the one hand, or engaging in that speech and risking [enforcement] on the other"); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (plaintiff had standing to bring pre-enforcement challenge as the "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Am. Encore v. Fontes*, 152 F.4th 1097, 1113 (9th Cir. 2025) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing," and "a chilling of the exercise of First Amendment rights is . . . a constitutionally sufficient

injury." (cleaned up) (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013))).

17. The legislative history confirms that California intends to enforce AB 1709. The Assembly Appropriations Committee expressly projected "[s]ignificant ongoing General Fund costs to the Department of Justice (DOJ) to . . . bring civil enforcement actions against covered platforms."[4] The Legislature thus anticipated not merely compliance with the Act, but active enforcement by the State against covered platforms. Public statements surrounding the law's enactment reinforce that understanding. In announcing the legislation, Governor Newsom stated that "[t]oday's legislation makes clear that California will not stand by while unregulated technology puts our children at risk."[5] The Governor further characterized the legislation as establishing the nation's "strongest" regulations governing social media and online technologies for minors.[6] These statements leave little doubt that California enacted AB 1709 as a robust regulatory measure and intends to pursue its enforcement.

18. Defendant Rob Bonta is the California Attorney General. Defendant is a California resident and is sued in his official capacity. The Act gives exclusive enforcement authority to the California Attorney General and local public prosecutors, § 22686(a), and empowers the Attorney General to designate additional "feature[s]" subject to regulation under the Act, § 22682(a)(3). Defendant has publicly pursued enforcement against Meta under other laws.

## JURISDICTION AND VENUE

19. Meta's causes of action arise under 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and the Communications Decency Act of 1996, 47 U.S.C. § 230. The Court therefore has jurisdiction under 28 U.S.C. § 1331. This Court has authority to grant legal and equitable relief under 42

---

[4] Assemb. Comm. on Appropriations, Analysis of AB 1709, 2025-2026 Reg. Sess., at 1–2 (Cal. May 12, 2026).

[5] Governor Gavin Newsom, *Governor Newsom Signs the Strongest Child Safety Chatbot and Social Media Laws in the Nation* (Sept. 10, 2026), https://www.gov.ca.gov/2026/09/10/governor-newsom-signs-the-strongest-child-safety-chatbot-and-social-media-laws-in-the-nation/.

[6] *Id.*

U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. §§ 2201(a)–2202.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Defendant performs his official duties in the Northern District of California, and is therefore considered to reside in this District as a matter of law, and because the injuries giving rise to this action have been and will continue to be suffered by Meta in San Mateo County, California.

## DIVISIONAL ASSIGNMENT

21. Pursuant to Civil L.R. 3-2(c), this case arises in the County of San Mateo, as a substantial part of the events or omissions giving rise to the claims occurred in the County of San Mateo. Plaintiff Meta is headquartered in the County of San Mateo and the impact of the Act on Meta, should it be deemed valid and enforceable, would be experienced there. The County of San Mateo is within the San Francisco and Oakland Divisions. *See* Civil L.R. 3-2(d). Further, Defendant has offices in San Francisco County and in Alameda County, which are also within the San Francisco or Oakland Divisions. *See* Civil L.R. 3-2(d). This case should therefore be assigned to the San Francisco or Oakland Divisions pursuant to Civil L.R. 3-2(d).

## BACKGROUND

22. Since Meta was founded in 2004, its services have enabled nearly four billion people around the world to share ideas, offer support, and discuss important topics, including politics, public health, and social issues. Every day, users of Meta's services share over a billion stories and reels combined and over 100 billion messages.[7]

23. On Facebook, individuals can sign up for an account and establish mutual connections with family and friends, sharing stories, photos, videos, captions, status updates, and links (among other types of content). They can also follow pages managed by businesses, organizations, government agencies, and

[7] Joana Rocha et al., *Unlock the Power of Reels Ads*, Meta (Nov. 7, 2024), https://developers.facebook.com/blog/post/2024/11/07/unlock-the-power-of-reel-ads/; Adam Mosseri & Stan Chudnovsky, *Say [Hi] to Messenger: Introducing New Messaging Features to Instagram*, Meta (Sept. 30, 2020), https://about.fb.com/news/2020/09/new-messaging-features-for-instagram/.

public figures (such as politicians or celebrities) that share content, as well as join groups or get information about events that relate to topics of interest to them.

24. On Instagram, individuals can likewise sign up for an account and establish mutual connections with family, friends, and other creators, sharing stories, photos, videos, captions, messages, and links (among other types of content). They can also follow and interact with Instagram accounts managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content.

25. On Threads, individuals can view and share public conversations. Depending on how an individual uses Threads, they can share posts or "threads," reply to others' posts, and follow profiles managed by other users, businesses, organizations, and public figures (such as politicians or celebrities) that share content.

26. Every day, users of Meta's services share billions of posts and messages that constitute speech fully protected from government restriction. Because it is impossible to display every piece of user-generated content that a user might be interested in, and because it is similarly difficult to nurture social connections without prioritizing the people and ideas a user is interested in, Facebook, Instagram, and Threads display users' speech through curated "stream[s] of other users' posts." *Moody*, 603 U.S. at 734.

27. The curation process begins long before a user logs into their account and sees a feed with personalized content recommendations. That process includes Meta's employees deciding what content-moderation policies to adopt and maintain on Facebook, Instagram, and Threads; and then Meta's employees implementing those policies through processes that include removal or demotion of content identified during human and/or automated review. Content moderation on Meta's apps is not a separate step in creating a feed, but instead is infused throughout the process of generating a user's feed.

28. A "key to the scheme" of generating a user's feed "is prioritization [and deprioritization] of content, achieved through the use of algorithms." *Id.* Employees at Meta build algorithms to "implement" its mission at scale—for example, to "prefer content" that Meta employees consider higher-quality while "disfavor[ing] posts" that, for example, in Meta's employees' judgment reflect a user "encourag[ing] teen suicide and self-injury." *Id.* at 734–37.

29. Meta's curation process also involves its employees deciding "how to display" third-party speech, *id*. at 716, including how it should be "arrange[d]" and "distribute[d]" on each user's screen and across multiple users. *Doe 1 v. Twitter*, 148 F.4th at 646. This includes, for example, choosing to display third-party content in the form of a notification to a user, deciding whether to require a user to take a deliberate action, like a swipe or a tap, to see video or audio content, and choosing to include pagination or breaks between posts of user-generated content.

30. One way that Facebook displays content is in Feed (formerly known as News Feed), which shows a constantly updated, personalized, and continuous list of content—for example, status updates from friends or elected officials, photos and videos from family gatherings, articles from local or national news outlets, information about upcoming community events or religious services, and much more. Some video, audio, and animation content plays automatically on Facebook.

31. Similarly, one way that Instagram displays content is Instagram Feed, which by default shows a continually updated and curated stream of photos and videos—for example, posts from friends, family, businesses, educational institutions, elected officials, neighborhood organizations, news outlets, and much more. Some video, audio, and animation content plays automatically on Instagram.

32. Threads also displays content in its For You feed, which shows a continually updated mix of posts from profiles that the user follows and recommended content from creators that the user has not yet discovered. Some video, audio, and animation content plays automatically on Threads.

**A. Meta enforces robust content moderation policies that affect what content appears throughout the feeds of content on Facebook, Instagram, and Threads.**

33. Meta wants Facebook, Instagram, and Threads to be places where people feel empowered to communicate. This is why Meta has developed content moderation policies that help determine what third-party content is seen by users on Facebook, Instagram, and Threads, including on each service's feeds.

34. These policies and practices reflect Meta's judgment about how it can best create a place for free expression, give people a voice, and empower people to talk openly about the issues that matter to them. When Meta does limit expression, it does so in the service of Meta's values of authenticity, safety, privacy, and dignity—*i.e.*, "the type of community [Meta] seeks to foster." *O'Handley v. Padilla*,

579 F. Supp. 3d 1163, 1188 (N.D. Cal. 2022) (quoting *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1108 (W.D. Tex. 2021)), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). Meta's editorial policies and practices are also in service of its belief that all people are equal in dignity and rights. Meta expects that users on its services will respect the dignity of others and not harass or degrade others. To ensure everyone's voice is valued, Meta prioritizes different views and beliefs, including "from people and communities that might otherwise be overlooked or marginalized."[8]

35. Meta's publicly available Community Standards[9] (which all users of Facebook, Instagram, and Threads must agree not to violate); Meta's Terms of Service[10] (to which users must agree to create an account on the Facebook service); Instagram Terms of Use[11] (to which users must agree to create an account on the Instagram service); and Threads Terms of Use[12] (to which users must agree to use the Threads service) describe what content is acceptable on Facebook, Instagram, and Threads.

36. The Meta Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights."[13] Similarly, the Instagram Terms of Use prohibit users from doing or sharing anything that is "unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose" or that would "violate[] someone else's rights," and from "post[ing] someone else's private or confidential information without permission."[14] And the Threads Terms of Use incorporate the same prohibition from the Instagram Terms by reference.[15]

---

[8] *Community Standards*, Meta, https://transparency.fb.com/policies/community-standards/ (last visited Nov. 3, 2026) [hereinafter Community Standards].

[9] *Id.*

[10] *Terms of Service Overview*, Meta (Jan. 1, 2025), https://www.facebook.com/terms.php [hereinafter Meta Terms].

[11] *Terms of Use*, Instagram, https://help.instagram.com/581066165581870 (last visited Nov. 3, 2026) [hereinafter Instagram Terms].

[12] *Threads Terms of Use*, Instagram (May 28, 2025), https://help.instagram.com/769983657850450 [hereinafter Threads Terms].

[13] Meta Terms, *supra*.

[14] Instagram Terms, *supra*.

[15] Threads Terms, *supra*.

37. Meta also has Community Standards, which Meta employees on its Content Policy team have developed and that are enforced by both human reviewers and automated processes that Meta employees have built to implement its human-developed standards. These Community Standards provide details about what user-generated content is not allowed on Facebook, Instagram, and Threads. They are organized into twenty-five separate policies restricting specific categories of content related to: (1) coordinating harm and promoting crime;[16] (2) dangerous organizations and individuals;[17] (3) prohibited commercial practices;[18] (4) restricted goods and services;[19] (5) violence and incitement;[20] (6) adult sexual exploitation;[21] (7) bullying and harassment;[22] (8) child sexual exploitation, abuse, and nudity;[23] (9) human exploitation;[24] (10) suicide, self-injury, and eating disorders;[25] (11) adult nudity and sexual activity;[26] (12)

---

16 *Coordinating Harm and Promoting Crime*, Meta (Sept. 2, 2026), https://transparency.meta.com/policies/community-standards/coordinating-harm-promoting-crime/.

17 *Dangerous Organizations and Individuals*, Meta (Mar. 20, 2026), https://transparency.meta.com/policies/community-standards/dangerous-individuals-organizations/.

18 *Prohibited Commercial Practices*, Meta (Oct. 29, 2026), https://transparency.meta.com/policies/community-standards/prohibited-commercial-practices/#policy-details.

19 *Restricted Goods and Services*, Meta (Sept. 9, 2026), https://transparency.meta.com/policies/community-standards/restricted-goods-services/.

20 *Violence and Incitement*, Meta (Sept. 27, 2024), https://transparency.meta.com/policies/community-standards/violence-incitement/.

21 *Adult Sexual Exploitation*, Meta (Mar. 4, 2026), https://transparency.meta.com/policies/community-standards/adult-sexual-exploitation/.

22 *Bullying and Harassment*, Meta (Oct. 29, 2026), https://transparency.meta.com/policies/community-standards/bullying-harassment/ [hereinafter Bullying and Harassment].

23 *Child Sexual Exploitation, Abuse, and Nudity*, Meta (July 31, 2025), https://transparency.meta.com/policies/community-standards/child-sexual-exploitation-abuse-nudity/.

24 *Human Exploitation*, Meta (Sept. 19, 2025), https://transparency.meta.com/policies/community-standards/human-exploitation/.

25 *Suicide, Self-Injury, and Eating Disorders*, Meta (Oct. 29, 2026), https://transparency.fb.com/policies/community-standards/suicide-self-injury/ [hereinafter Suicide, Self-Injury, and Eating Disorders].

26 *Adult Nudity and Sexual Activity*, Meta (Aug. 29, 2025), https://transparency.meta.com/policies/community-standards/adult-nudity-sexual-activity/.

adult sexual solicitation and sexually explicit language;[27] (13) hateful conduct;[28] (14) privacy violations;[29] (15) violent and graphic conduct;[30] (16) account integrity;[31] (17) authentic identity representation;[32] (18) cybersecurity;[33] (19) inauthentic behavior;[34] (20) memorialization;[35] (21) misinformation;[36] (22) spam;[37] (23) third-party intellectual property infringement;[38] (24) using Meta intellectual property and licenses;[39] and (25) locally illegal content, products, or services.[40]

---

[27] *Adult Sexual Solicitation and Sexually Explicit Language*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/sexual-solicitation/.

[28] *Hateful Conduct*, Meta (Jan. 8, 2025), https://transparency.meta.com/policies/community-standards/hateful-conduct/.

[29] *Privacy Violations*, Meta (Apr. 30, 2026), https://transparency.meta.com/policies/community-standards/privacy-violations/.

[30] *Violent and Graphic Content*, Meta (Aug. 27, 2026), https://transparency.meta.com/policies/community-standards/violent-graphic-content/.

[31] *Account Integrity*, Meta (May 28, 2026), https://transparency.meta.com/policies/community-standards/account-integrity/.

[32] *Authentic Identity Representation*, Meta (Sept. 11, 2026), https://transparency.meta.com/policies/community-standards/authentic-identity-representation.

[33] *Cybersecurity*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/cybersecurity/.

[34] *Inauthentic Behavior*, Meta (Dec. 11, 2025), https://transparency.meta.com/policies/community-standards/inauthentic-behavior/.

[35] *Memorialization*, Meta (Oct. 9, 2024), https://transparency.meta.com/policies/community-standards/memorialization/.

[36] *Misinformation*, Meta (Apr. 7, 2025), https://transparency.meta.com/policies/community-standards/misinformation/.

[37] *Spam*, Meta (June 26, 2024), https://transparency.meta.com/policies/community-standards/spam/ [hereinafter Spam].

[38] *Third-Party Intellectual Property Infringement*, Meta (Aug. 27, 2024), https://transparency.meta.com/policies/community-standards/intellectual-property/.

[39] *Using Meta Intellectual Property and Licenses*, Meta, https://transparency.meta.com/policies/community-standards/meta-intellectual-property (last visited Nov. 3, 2026).

[40] *Locally Illegal Content, Products, or Services*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/locally-illegal-products-services.

38. Much of the user-generated content falling within these policies is flatly prohibited—and, when detected and determined to be violating by Meta, removed—across Facebook, Instagram, and Threads. Other category-specific policies identify content that Meta chooses to hide from teens, label, place behind a warning screen, and/or deprioritize for certain (or all) users on Facebook, Instagram, and Threads. For example, content celebrating or promoting suicide, self-injury, or eating disorders is prohibited and is removed for all users when detected and determined by Meta to violate its Community Standards. Content discussing these topics (but not celebrating or promoting them) is generally allowed. But content about recovery from suicide, self-injury, or eating disorders that may contain imagery that could be upsetting (such as a healed scar) may be placed behind a warning screen for adults aged 18 and older while being hidden entirely from teens.[41] And recently, Meta reviewed its age-appropriate content guidelines—the guidelines that determine what content Meta hides from teens and avoids recommending to them—against the kinds of content standards that inform age-appropriate movie ratings, with the goal of having teens see content that is generally similar to what they would see in an age-appropriate movie.[42]

39. Meta undertakes significant efforts to develop and enforce its Community Standards. Meta frequently collaborates with subject matter experts, including to receive input on and to craft these standards, which Meta updates regularly. And Meta employs dedicated human reviewers and custom-built artificial intelligence technologies to enforce these standards at scale.[43] For example, in the second quarter of 2026 alone, Meta (through its human reviewers and its artificial intelligence technologies) took action on the following (*i.e.*, by removing content, placing it behind a warning screen, or disabling accounts):[44]

---

[41] Suicide, Self-Injury, and Eating Disorders, *supra.*

[42] *Helping Teens See Age-Appropriate Content*, Meta (May 13, 2026), https://transparency.meta.com/policies/age-appropriate-content/.

[43] *How Review Teams Work*, Meta (Nov. 12, 2024), https://transparency.meta.com/enforcement/detecting-violations/how-review-teams-work/; *How Technology Detects Violations*, Meta (Oct. 18, 2023), https://transparency.meta.com/enforcement/detecting-violations/technology-detects-violations/; *How Enforcement Technology Works*, Meta (Nov. 12, 2024), https://transparency.meta.com/enforcement/detecting-violations/how-enforcement-technology-works/.

[44] *Content Actioned*, Meta (Nov. 6, 2024), https://transparency.meta.com/policies/improving/content-actioned-metric/.

a. 6.9 million pieces of content on Facebook and 12.8 million pieces of content on Instagram that violated its suicide, self-injury, and eating disorder policy;

b. 12.3 million pieces of content on Facebook and 5.1 million pieces of content on Instagram that violated its child sexual exploitation policy; and

c. 84 million pieces of content on Facebook and 36.3 million pieces of content on Instagram that violated its spam policy.[45]

d. Meta's enforcement teams took action on even more user-generated content in other ways, such as hiding it from teens and/or deprioritizing it for some or all users.

**B. Meta makes editorial judgments to facilitate the display of user content on Facebook, Instagram, and Threads.**

40. Meta wants to create an environment where users feel inspired to make and foster social connections on Facebook, Instagram, and Threads. For example, Meta might promote diverse topics and creators, prioritize new content from budding creators, and recommend content with the goal of inspiring users to create similar content. Meta also works towards this goal by personalizing recommendations and avoiding recommendations that Meta itself considers low-quality, objectionable, particularly sensitive, or inappropriate for younger audiences.[46] Meta also takes steps to make the content presented to users accessible to them, such as by automatically playing video or audio rather than forcing users to repetitively click on expressive clips to view them.

41. Through its content curation efforts, Meta intends to communicate a message to its users that, within the bounds of Meta's Community Standards, their particular interests and preferences are reflected on Facebook, Instagram, and Threads, and Meta wants them to feel empowered to communicate and talk openly about the topics that matter to them.

---

[45] *Community Standards Enforcement Report*, Meta, https://transparency.meta.com/data/community-standards-enforcement/ (last visited Nov. 3, 2026).

[46] *About Recommendations on Facebook*, Facebook Help Center, https://www.facebook.com/help/1257205004624246 (last visited Nov. 3, 2026); *Recommendations on Instagram*, Instagram, https://help.instagram.com/313829416281232/?helpref=uf_share (last visited Nov. 3, 2026).

42. Thus, Meta's feeds—the feeds on Facebook, Instagram, and Threads—display constantly updated, personalized, and curated lists of connected third-party content and/or recommended third-party content. "[*I*]*n toto*"—through Meta's editorial choices about what content to display and how to display it—Meta's feeds convey its editorial "messages," including that people should be able to communicate openly about the issues that matter to them. *Moody*, 603 U.S. at 739. Meta's editorial goal is that each user sees posts from the people, interests, and ideas that they find valuable, whether that content comes from people they are already connected to or from those they may not yet know.[47]

43. Meta's user-specific and user-independent choices about how to "cull and organize uploaded posts in a variety of ways" create a speech environment that advances this editorial goal. *Moody*, 603 U.S. at 719, 739. For example, Meta may prioritize content it believes a particular user will find most relevant and valuable or that other users have identified as particularly newsworthy.[48]

44. Meta will also deprioritize content, which makes it less likely to be seen in a user's feed. Meta deprioritizes content that it predicts will be of low value because the commenter or poster is a frequent violator of Meta's rules or the content is of a type that users broadly dislike, such as clickbait or engagement bait. Meta also deprioritizes third-party content if Meta predicts that the content is likely violative of its Community Standards (but has not yet confirmed as much), if Meta predicts that the user will report the content for violating Meta's policies, or if Meta predicts that the content is similar to that which a user has told Meta they do not want to see, such as through Facebook content preference settings (where users can choose to see less, *inter alia*, political or sensitive content); Facebook, Instagram, or Threads sensitive content controls; and Facebook and Instagram's Limited Content, Ages 13+, and More Content controls.[49]

---

[47] *Our Approach to Facebook Feed Ranking*, Meta (June 11, 2025), https://transparency.meta.com/features/ranking-and-content/ [hereinafter Facebook Feed Ranking].

[48] *Our Approach to Newsworthy Content*, Meta (Nov. 12, 2024), https://transparency.meta.com/features/approach-to-newsworthy-content/.

[49] Facebook Feed Ranking, *supra*; *How to See More of What You Want on Instagram*, Instagram (Aug. 30, 2022), https://about.instagram.com/blog/tips-and-tricks/control-your-instagram-feed; *Instagram Threads Feed AI System*, Meta (Mar. 7, 2025), https://transparency.meta.com/features/explaining-ranking/ig-threads-feed/?referrer=1; *Types of Content We Demote*, Meta (July 2, 2025), https://transparency.meta.com/features/approach-to-ranking/types-of-content-we-demote.

45. Meta's Facebook Recommendation Guidelines apply to Facebook, and Meta's Instagram Recommendation Guidelines apply to Instagram and Threads. These guidelines set forth categories of content that are allowed on Meta's services but may not be eligible for recommendation, such as content that impedes Meta's desire to foster a safe community (*e.g.*, content depicting or trivializing themes around death or depression) and content about health or finance that Meta itself considers sensitive or low-quality (*e.g.*, content promoting or depicting cosmetic procedures).

46. Much of the content that Meta avoids recommending to adults is already completely hidden for teens. But Meta may take the further step of not recommending to teens certain types of potentially sensitive content that is neither hidden from them nor unrecommendable for adults, such as photos or videos that may be seen as implicitly sexual.

47. Meta also offers users of Facebook, Instagram, and Threads tools to adjust the amount of certain types of content they see in the feeds on these services.[50]

48. For example, among other settings, users of all ages can use the Political Content Control setting on Instagram, Threads, and Facebook to see more or less content in their feeds that Meta, in its judgment, has determined qualifies as political content (such as content that refers to governments, elections, or social topics that may affect many people). Users can also use the "Interested, Not Interested" feature in Facebook Feed, Videos, and Reels and the "Not Interested" feature on Instagram and Threads to see more or less content similar to a particular post.[51] Adults can adjust their Sensitive Content Control settings to "See less," "See more," or see a "Standard" amount of content in their feeds that Meta, in the judgment of its human personnel, has determined may be upsetting or offensive to some users.

---

[50] *See, e.g.*, *Updates to the Sensitive Content Control*, Instagram (June 6, 2022), https://about.instagram.com/blog/announcements/updates-to-the-sensitive-content-control; *About Sensitive Content Control on Instagram*, Instagram, https://www.facebook.com/help/instagram/1055538028699165/ (last visited Nov. 3, 2026); *See and Adjust Your Facebook Content Preferences*, Facebook, https://www.facebook.com/help/371675846332829/ (last visited Nov. 3, 2026); *How Teen Accounts Work on Facebook*, Facebook, https://www.facebook.com/help/1123135202753352/ (last visited Nov. 3, 2026).

[51] *Our Approach to Political Content*, Meta (Sept. 18, 2025), https://transparency.meta.com/en-us/features/approach-to-political-content.

49. On Facebook and Instagram, teens aged 13–17—both users who list a teen birthday and users Meta proactively identifies as suspected teens—are placed by default in Meta's "Ages 13+" content setting. Meta's goal for the "Ages 13+" content setting is to ensure that teens see content that is generally similar to what teens would see in an age-appropriate movie, and to try to hide more content that Meta believes may be inappropriate for people under 18 (such as content where a person is describing their own personal experiences with suicide, self-injury or eating disorders). Meta's "Ages 13+" content setting was developed by human personnel at Meta in consultation with external experts, parents and teens, and affects the content teens see on Facebook and Instagram.[52]

50. Teens on Instagram may also choose to enroll in the even stricter "Limited Content" setting (and a supervising parent or guardian can also enroll their teens in this setting). Personnel at Meta developed the "Limited Content" setting based on their judgment regarding what content should be permitted and not permitted in this even stricter setting. On both Facebook and Instagram, teens with the permission of their supervising parent or guardian may opt out of the "Ages 13+" setting and instead enroll in a "More Content" setting that personnel at Meta have developed to more generally align with content ratings for ages 18+.[53]

51. On Threads, teens are automatically defaulted to "See less" potentially upsetting or offensive content. Teens aged 13–17 who are enrolled in parental supervision can enroll in a "Standard"

---

[52] *Content Setting for Teen Accounts*, Instagram https://help.instagram.com/1470609900735343?helpref=faq_content (last visited Nov. 3, 2026) [hereinafter Content Settings for Instagram Teen Accounts]; *Helping Teens See Age-Appropriate Content*, Meta (May 13, 2026), https://transparency.meta.com/policies/age-appropriate-content/; *New 13+ Content Settings for Teen Accounts Expanding Globally on Instagram, Facebook, and Messenger*, Meta (June 2, 2026), https://about.fb.com/news/2026/06/new-13-plus-content-settings-for-teen-accounts-expanding-globally-on-instagram-facebook-messenger/; *New AI-Powered Age Assurance Measures to Place Teens in Age-Appropriate Experiences*, Meta (July 31, 2026), https://about.fb.com/news/2026/05/ai-age-assurance-teens/; *Content Settings for Teen Accounts on Facebook and Messenger*, Facebook, https://www.facebook.com/help/2199421724162175?helpref=maisa (last visited Nov. 3, 2026) [hereinafter Content Settings for Facebook Teen Accounts].

[53] Content Settings for Instagram Teen Accounts, *supra*; Content Settings for Facebook Teen Accounts, *supra*.

content experience only with a supervising parent or guardian's permission (and teens aged 16–17 who are not enrolled in parental supervision can enroll in "Standard" themselves).[54]

52. Meta will account for each user's content settings—including the "Limited Content," "Ages 13+," "More Content," "See less," "Standard," "See more," and Political Content Control settings, as well as "Interested" and "Not Interested" preferences—when determining what content to display in their feeds on Facebook, Instagram, and Threads.

53. Meta's feeds are "therefore [not] feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards. Like them or loathe them, [Meta's] Community Standards . . . make a wealth of . . . judgments about what kinds of speech, including what viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . main feeds," in addition to those on Instagram and Threads. *Moody*, 603 U.S. at 736 n.5.

54. Moreover, Meta's ranking and recommendation systems are not based solely on predictions of what individual content item will be relevant to a user based on their activity on the service. They are also designed to promote new content from small creators to progressively larger audiences (in service of Meta's goal to inspire content creation), to ensure users see a mix of posts from users they are connected with as well as recommended posts from others, to avoid presenting to users multiple videos in a row on the same topic or multiple videos in a row from the same creator, to show users more of the types of content they have told Meta that they want to see, and to present users with less content that Meta believes they are likely to report as violative of Meta's content policies.

**C. Parents already have several options to restrict or limit their teens' access to Facebook, Instagram, and Threads should they wish to do so.**

55. Parents who want to restrict, limit, control, and oversee their teens' access to Facebook, Instagram, and Threads have myriad options for doing so.

---

[54] *About Sensitive Content Control on Threads*, Instagram, https://www.facebook.com/help/instagram/2031788317323900/ (last visited Nov. 3, 2026).

56. Meta empowers parents to work collaboratively with their teens to help them create, explore and connect in age-appropriate ways.[55] For example, parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens or limit use during select days and hours and set reminders to close the app. Parents and guardians will soon be able to change their teen's default settings to require non-personalized feeds and stop video and animation content from automatically playing without a deliberate user action. In addition, parents and guardians can see which accounts their teen is following, that are following their teen, and that their teen has blocked; view the categories of topics their teen is seeing and wants to see more of; remove teens' ability to see, leave, or receive comments under posts; see their teen's settings for account privacy and messaging; see and change their teen's content settings; learn when their teen links a secondary account; know when their teen is interacting with a potentially suspicious account; and approve or deny their teen's requests to change default protection and privacy settings to a less strict state.[56] Meta also provides publicly accessible and free educational resources for interested parents to learn how to use these tools.[57]

57. Meta is also in the process of rolling out several additional default protections for California teens, including more robust age-verification processes; a default two-hour daily time limit that

---

[55] *Family Center*, Meta, https://familycenter.meta.com/ (last visited Nov. 3, 2026).

[56] *Giving Teens and Parents More Ways to Manage Their Time on Our Apps*, Meta (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/; *Introducing Stricter Message Settings for Teens on Instagram and Facebook*, Meta (Jan. 25, 2024), https://about.fb.com/news/2024/01/introducing-stricter-message-settings-for-teens-on-instagram-and-facebook/; *Parental Supervision,* Instagram, https://help.instagram.com/309877544512275 (last visited Nov. 3, 2026); *Safety Resources for Parents*, Facebook, https://www.facebook.com/help/1079477105456277 (last visited Nov. 3, 2026); *See Who Your Teen Has Chats With on Instagram*, Instagram, https://help.instagram.com/501423385831907 (last visited Nov. 3, 2026); *Instagram Teen Accounts Will Be Guided by PG-13 Ratings*, Meta (Oct. 14, 2025), https://about.fb.com/news/2025/10/instagram-teen-accounts-pg-13-ratings/; *New Parental Supervision Tools Coming To Threads*, Meta (July 21, 2026), https://about.fb.com/news/2026/07/new-parental-supervision-tools-coming-threads/; *New Supervision Tools Give Parents Insights Into Their Teen's Algorithm and More*, Meta (May 12, 2026), https://about.fb.com/news/2026/05/new-supervision-tools-parents-insights-teens-algorithm/.

[57] *See, e.g.*, *Helping Your Teen Navigate Instagram Safely*, Instagram, https://about.instagram.com/community/parents (last visited Nov. 3, 2026); *Well-Being Tools*, Meta, https://www.meta.com/safety/topics/safety-basics/tools/wellbeing/ (last visited Nov. 3, 2026); *Meta Family Center Resources Hub*, Meta, https://familycenter.meta.com/resources/ (last visited Nov. 3, 2026).

is cumulative across Facebook and Instagram; a default block on nighttime (12 a.m. to 6 a.m.) access; default muted push notifications between 8 a.m. and 3 p.m. on school days (Monday to Friday between August 15 and June 15); and a default block on seeing the number of likes and reactions on posts. Meta expects these defaults to be in place in the coming months. Should parents and guardians so choose, they can collaborate with their teens to change these default settings, but teens will not be able to change them without such permission.

58. Several other options also exist for parents to restrict or limit their teen's access to internet websites (including Facebook, Instagram, or Threads) in general. Parents can decide whether and when to let their teens use computers, tablets, and smartphones in the first place. They can also determine whether, when, and how their teens access the internet by deciding to purchase a personal phone plan for their teen or internet service for their household. Cell carriers and broadband providers provide parents with tools to block certain apps and sites from their teens' devices, ensure that they are texting and chatting with trusted contacts only, and restrict access to screen time during certain hours of the day.[58]

59. In addition, many wireless routers (the devices that provide wireless internet connectivity throughout a home) offer parental control settings.[59] Parents can use these settings to block certain websites or online services that they deem inappropriate, set individualized content filters for their teens, and monitor the websites their teens visit and the services they use.[60] Parents can also use router settings to turn off their home internet at particular times of day, pause internet access for a particular device or user, or limit the amount of time that a teen can spend on a particular website or online service.[61]

---

[58] *See, e.g.*, *Verizon Family*, Verizon, https://tinyurl.com/yc527nvx (last visited Nov. 3, 2026); *Guide to Parental Controls for Your Kid's Phone or Tablet*, AT&T, https://tinyurl.com/2mbnsfn5 (last visited Nov. 3, 2026); *Make Digital Parenting Control Easier with FamilyMode®*, T-Mobile, https://www.t-mobile.com/apps/t-mobile-family-mode?msockid=2219f7fdb38c6ba91545e0ceb2cb6a01 (last visited Nov. 3, 2026); *Set Up Parental Controls for Your Home Network*, Comcast Xfinity, https://tinyurl.com/5acdsnat (last visited Nov. 3, 2026).

[59] *See* Molly Price & Ry Crist, *Parental Controls are Easy to Set Up on Your Wi-Fi Router: Here's How to Do It*, CNET (June 26, 2025), https://www.cnet.com/home/internet/parental-controls-are-easy-to-set-up-on-your-wi-fi-router-heres-how-to-do-it/.

[60] *See NETGEAR Smart Parental Controls*, NETGEAR, https://www.netgear.com/home/services/smart-parental-controls/ (last visited Nov. 3, 2026).

[61] *See id.*

60. Additional parental controls are available at the device level. For example, iPhones and iPads enable parents to approve or decline their teen's app download requests, limit the amount of time their teens can spend on the device, choose which applications their teens can use, set age-related content restrictions for those applications, filter online content, and control privacy settings.[62] Google and Microsoft offer similar parental controls for devices using their operating systems.[63] In addition, numerous third-party applications allow parents to control and monitor their teens' use of internet-connected devices and online services.[64]

**D. California has already enacted several social media laws that have been found unconstitutional at least in part.**

61. This is not the first time that California has attempted to impose unconstitutional restrictions on teens' access to what are commonly known as "social media" platforms.

62. On September 15, 2022, California Governor Gavin Newsom signed the California Age-Appropriate Design Code Act ("CAADCA"), Civil Code § 1798.99.28 *et seq.* That law, which purported to regulate covered businesses offering online services "likely to be accessed by children," required covered businesses to prepare burdensome "Data Protection Impact Assessment[s]," Civ. Code § 1798.99.31(a)(1). The Ninth Circuit held that this requirement unconstitutionally compels speech. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024). The CAADCA also prohibited covered businesses from using minors' personal data in a manner "materially detrimental to [their] physical health, mental health, or well-being" or inconsistent with "the best interests of children." Civ. Code § 1798.99.31(b)(1)–(4). The Ninth Circuit held that this provision is unconstitutional on vagueness grounds. *NetChoice, LLC v. Bonta*, 170 F.4th 744, 764–66 (9th Cir. 2026).

---

[62] *See Set Up Parental Controls to Manage Your Child's iPhone or iPad*, Apple, https://tinyurl.com/2wpjvjwh (last visited Nov. 3, 2026); *Approve What Kids Buy With Ask to Buy*, Apple, https://support.apple.com/en-us/105055 (last visited Nov. 3, 2026).

[63] *See Helping You Set Digital Ground Rules*, Google Safety Center, https://tinyurl.com/43eks8uj (last visited Nov. 3, 2026); *Microsoft Family Safety*, Microsoft, https://tinyurl.com/bp9s4yrf (last visited Nov. 3, 2026).

[64] *See* Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://tinyurl.com/43537k92.

63. On September 20, 2024, Governor Newsom signed the Protecting Our Kids from Social Media Addiction Act ("SB 976"), Health & Safety Code § 27000 *et seq*. Much like AB 1709, that law restricts covered services such as Facebook, Instagram, and Threads from making personalized content recommendations to minors—but, unlike AB 1709, allows their display with parental consent (and also applies to teens up through age seventeen). Health & Safety Code § 27001(a); *see also* §§ 27002(b)(2), (b)(4) (requiring duplicative default settings). Meta has sued to enjoin SB 976's personalized-feed restrictions, and its challenge to them is currently pending before the Ninth Circuit. *See Meta Platforms, Inc. v. Bonta*, No. 26-5120 (9th Cir. Aug. 11, 2026). SB 976's additional provisions prohibiting nighttime notifications and "like" counts without parental consent, Health & Safety Code §§ 27002(a), 27002(b)(1), (3), have been deemed unconstitutional and preliminarily enjoined, *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1227–28 (N.D. Cal. 2024) (notifications); *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016–17 (9th Cir. 2025) ("like" counts).

**E. California again attempts to interfere with Meta's curation of its Facebook, Instagram, and Threads feeds by enacting AB 1709.**

**1. AB 1709 overrides Meta's editorial judgments concerning what content it will display and how it will display it.**

64. The California Legislature passed AB 1709 on August 31, 2026, and Governor Newsom signed the law on September 10, 2026. All provisions of the Act will go into effect on January 1, 2027. *See* Cal. Gov't Code § 9600 ("a statute enacted at a regular session shall [generally] go into effect on January 1 next").

65. ***Scope of Coverage.*** AB 1709 regulates "covered platforms," defined to include online services such as Facebook, Instagram, and Threads. § 22682(c). To be covered, the online service must offer a covered feature "as a significant part of the service provided." *Id.* As signed by the Governor, the Act identifies two covered features: (1) "feeds" that include personalized content recommendations ("personalized feeds"); and (2) "autoplay." § 22682(a). Because personalized feeds are further defined to only cover feeds that include user-generated content, § 22682(b), the Act's scoping effectively reflects a preference for services that provide first-party content (*e.g.*, video and music streaming services may be excluded) over services that provide content generated or shared by users (*e.g.*, Facebook, Instagram, and Threads).

66. AB 1709 also entirely exempts services where "interactions between users are limited to commercial transactions or to consumer reviews" or services that operate feeds "for the primary purpose of cloud storage." § 22682(c)(2).

67. ***Ban on Covered Features.*** AB 1709 bans Facebook, Instagram, and Threads from providing any covered feature to any user under sixteen years of age. § 22683(a)(1). Covered services must also "implement reasonable measures to ensure that [minors] are not provided any" covered feature. § 22683(b). Covered features include personalized feeds, "autoplay," and "[a]ny other feature defined in regulations adopted pursuant to Section 22685 as" a covered feature. § 22682(a); *see* § 22685 (authorizing the California Attorney General to "adopt regulations . . . in order to further the purpose of protecting minors online").[65]

68. The Act defines a personalized feed as "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based . . . on information provided by the user or otherwise associated with the user or the user's device," § 22682(b), with seven enumerated exemptions. These exemptions include feeds of user-generated content "recommended, selected, or prioritized for display" based on:

a. "information [that] is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others" (*e.g.*, curation accounting for a device's location may be exempt as not "persistently" associated with a user or their device, but curation accounting for the minor user's stated place of residence may not be), § 22682(b)(1);

b. "search terms that are not persistently associated with [a] user or user's device" (*e.g.*, curation accounting for a user's search for "San Francisco Giants" content may be exempt for a brief period, but a feed may be covered if it displays such content to the same user again outside of their specific search), § 22682(b)(2);

[65] As of the date of this complaint, no such regulations have been adopted, and Meta reserves its right to challenge any such regulations (whether in this lawsuit or a separate one).

c. "user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor" (*e.g.*, curation accounting for whether a user is a "minor" in general may be exempt, but curation accounting for a user's more granular age—such as under sixteen—may not be), § 22682(b)(3);

d. "express[] and unambiguous[] request[s]" for "specific media" or content created by a specific user, so long as "audio or video content[] is not automatically played" (*e.g.*, curation accounting for who the user "follows" may be exempt, but curation accounting for a user's desire to see a feed of "baseball" content may not be), § 22682(b)(4);

e. direct messages between users, § 22682(b)(5);

f. "a preexisting sequence from the same author, creator, poster, or source" so long as "audio or video content is not automatically played" (*e.g.*, feeds of a single creator's content in chronological order may be exempt, but chronological feeds of two or more creators' content may not be), § 22682(b)(6); and

g. "necess[ity]" for compliance with AB 1709 or regulations adopted thereunder, § 22682(b)(7).

69. ***Account Deletion Requirement.*** AB 1709 requires covered services to "delete the account of a user under 16 years of age and any personal information associated with" it unless the user is able to maintain an account that includes no covered features. § 22684(b).

70. ***Age Verification Requirement.*** AB 1709 bans any covered service from providing covered features to any user of any age unless the service implements an age verification system. § 22684(a). If available, covered services must rely on age-bracket signals transmitted to the covered service from an application store pursuant to the Digital Age Assurance Act, Civ. Code § 1798.500 *et seq.*, which is also effective as of January 1, 2027. § 22684(a)(1).

71. ***Threatened Civil Penalties.*** The Act threatens civil penalties of up to $50,000 and $25,000 "per affected minor" for knowing and negligent violations, respectively. § 22686(b).

**2. AB 1709 infringes upon Meta's constitutional and statutory rights.**

72. Through its ban on covered features and the associated account-deletion requirement, AB 1709 unlawfully dictates how Meta may curate, publish, and disseminate user-generated content under the threat of substantial civil liability, in contravention of the First Amendment and Section 230.

73. As applied to Meta's Facebook, Instagram, and Threads services, the Act's coverage is both content-based and speaker-based. The Act's restrictions discriminate against content "generated or shared by users" because only feeds displaying such content can qualify a service for coverage under the Act (and the fact that Meta's feeds of user-generated content comprise a significant part of its services is what qualifies it for coverage under the Act).[66] § 22682(c)(1); *see NetChoice v. Jones*, 822 F. Supp. 3d 656, 673 (E.D. Va. 2026) ("Here, Virginia chose to regulate user-generated content, but not provider-selected content, because it concluded that user-generated content is more harmful. . . . This is precisely the type of speaker preference the Supreme Court declared should be treated as content-based."); *NetChoice, LLC v. Griffin* ("*Griffin I*"), 2023 WL 5660155, at *3 (W.D. Ark. Aug. 31, 2023) (exemption for websites that "pre-select . . . content" supports the "susp[icion] that the regulation may not be content neutral"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1122–23 (D. Utah 2024) ("singl[ing] out social media companies based on the[ir] 'social' subject matter" constitutes content-based scoping).

74. AB 1709 is also content-based and speaker-based because it excludes entirely (1) "internet website[s] . . . for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof"; and (2) "internet website[s], online service[s], online application[s], or mobile application[s] that operate[] a feed for the primary purpose of cloud storage." § 22682(c)(2).

75. These statutory carveouts exempt a broad range of favored speakers and content from the personalized-feed and autoplay bans. Facebook, Instagram, and Threads may not display feeds that include any personally recommended content, but services that do not display *user-generated* content as a significant part of their service—like video and music streaming services—can continue to curate feeds

---

[66] While Meta automatically plays some video content on its services, that feature is not itself a significant part of the Facebook, Instagram, or Threads services.

of content based in whole or part on what may be most relevant and valuable for a particular user. And commercial review websites like Yelp need not comply with the Act at all.

76. The Act is additionally content-based and speaker-based because the State's justification reveals a content-based motivation to protect minors from protected speech. *See Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019) (where state's justifications "stem from the direct communicative impact of speech," that means the statute "regulates speech on the basis of its content"); *see also* AB 1709 § 1(c)–(d) (evincing a desire to protect minors from purported harms associated with "time spent" viewing disfavored online content); *id.* § 1(i) (suggesting a desire to restrict speech consumption leading to "diminished attention, reduced cognitive control, impaired memory and analytical skills, and decreased capacity for deep interpersonal interaction"). The legislative history makes clear this content-based motivation: the Legislature relied on correlational studies finding that viewing other users' posts may be associated with body dissatisfaction and disordered eating for some users; that depictions of self-harm content may "normalize such behaviors"; research associating a "fear of missing out" based on content showing "others might be having rewarding experiences" to depression and anxiety; and studies suggesting that adolescents sometimes encounter "hate-based" content online. And the law is clear that such a content-based motivation—including "a concern that stems from the direct communicative impact of speech"—means a statute must be treated as content-based. *Tschida*, 924 F.3d at 1303 (quotation omitted).

77. The Act "shall be enforced by a civil action brought only by the Attorney General or a local public prosecutor." § 22686(a). Defendant has publicly pursued enforcement against Meta under other laws.

## **CLAIMS**

78. The challenged provisions of the Act violate federal law and deprive Meta and its users of enforceable federal rights. Both as a matter of statutory and equitable authority, federal courts have the power to enjoin unlawful actions by state officials. *See* 42 U.S.C. § 1983; *see, e.g.*, *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326 (2015) (reaffirming that under the equitable cause of action recognized in *Ex parte Young*, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted"); *Livadas v.*

*Bradshaw*, 512 U.S. 107, 132–34 (1994) (holding state law preempted in cause of action brought under 42 U.S.C. § 1983). The Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing these provisions against Meta.

79. Further, with exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). This Court can and should exercise its equitable power to enter a declaration that the challenged provisions of the Act are unconstitutional and otherwise unlawful as applied to Meta's services.

80. Through this action, Meta asserts an as-applied challenge under the First and Fourteenth Amendments to the Act's personalized-feed and autoplay bans, § 22683, and account-deletion requirement, § 22684(b), with respect to Meta's Facebook, Instagram, and Threads services.

81. Meta further asserts that the Act's personalized-feed and autoplay bans and account-deletion requirement under §§ 22683 and 22684(b) are preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

## COUNT ONE
**42 U.S.C. § 1983; *Ex parte Young***
**As-Applied Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**
**(Ban on Personalized Feeds, §§ 22682(a)(1), 22682(c), 22683, 22684(b))**

82. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

83. As applied to Facebook, Instagram, and Threads, the personalized-feed ban is an unconstitutional regulation of protected First Amendment expressive activity. § 22683(a)(1).

84. All of Meta's feeds are the products of Meta's "expressive choices" in deciding which user-generated "content [its] feeds will display, or how the display will be ordered and organized." *Moody*, 603 U.S. at 740. Meta "make[s] a wealth of . . . judgments about what kinds of speech, including what viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . feeds" as well as the feeds on Instagram and Threads. *Id.* at 736 n.5. "And because that is true, [Meta's feeds] receive First Amendment protection." *Id.* at 740.

85. Yet the Act would prohibit feeds containing personalized user-shared media that is "recommended, selected, or prioritized for display to a user" while permitting non-personalized feeds organized in accordance with the State's editorial standards as set forth in the exceptions—such as nonpersistent data, user settings, and requested or private content. § 22682(b).

86. The Act's personalized-feed ban thus would prohibit Meta from disseminating its fully protected "compilations of [third-party] expression" to minors unless Meta complies with the State's editorial dictates about how Meta should "organize and prioritize" the user-generated content in Meta's feeds. *Moody*, 603 U.S. at 716.

87. Because the personalized-feed ban burdens and restricts Meta "from compiling the third-party speech it wants in the way it wants" on Facebook, Instagram, and Threads, it is subject to and "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 718.

88. The Act's imposed editorial standards would interfere with Meta's implementation of its value-based judgments that some content should be hidden for certain types of users. For example, Meta determines, based on its exercise of judgment, what kinds of user-generated content may be appropriate across the Limited Content, Ages 13+, or More Content settings on Instagram. While Meta defaults teens to the Ages 13+ setting on Instagram, teens may elect to instead be placed in the more restrictive Limited Content setting. But the Act would restrict Meta from disseminating curated compilations of third-party speech while accounting for individual users' preferences as between the Limited Content and Ages 13+ content settings. *See* § 22682(b).

89. The State's editorial standards would also interfere with Meta's ability to avoid recommendations of content that Meta believes a particular user disfavors or will find of low value. Across Facebook, Instagram, and Threads, the Act would restrict Meta from deprioritizing content based on an individual user's content preference settings. *See* § 22682(b)(4) (exempting certain feeds, but only if the user's "prioritization[] or deprioritization" requests concern "*specific* media" and the feed does not "automatically play[]" "audio or video content" (emphasis added)). For example, it may prevent Meta from deprioritizing lawful posts concerning political or other controversial or sensitive topics after the user has indicated that she does not want such content recommended.

90. The State's editorial standards would also interfere with Meta's ability to recommend to users the content that Meta believes those users will want to see. For example, if a teen has previously demonstrated an interest in science experiments or content about local scholarships, the Act would preclude Meta from recommending additional content about science experiments or local scholarships to that user unless they specifically enter keyword searches for "science experiment" or "local scholarships" every single time they log in. *See* § 22682(b)(2) (exempting certain feeds, but only if they are recommending content based on "search terms that are not persistently associated with the user or user's device"). The same is true of content about California trade schools, colleges and universities, military recruitment, local volunteer opportunities, the San Francisco Chronicle, and California public officials. And if a teen has already seen content from the San Francisco Chronicle or a public official—such as a breaking news story or a sound clip from a recent debate—the Act may preclude Meta from using that user-specific information to avoid showing the identical content to the same teen again. *See* § 22682(b)(1) (exempting certain feeds, but only if they are recommending content that "does not concern the user's previous interactions with media generated or shared by others").

91. That Meta's editorial judgments are, in part, based on its perception of users' interests does not render them unprotected by the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 575–78 (2011) (invalidating statute that would have prohibited dissemination of doctor-specific prescribing information and explaining that just because speech is "instructive" or "persuasive" does not "justify the government's attempts to stifle it"). Newspaper editors, booksellers, cable operators, radio DJs, and festival organizers have long selected content with an eye toward presenting material relevant to particular audiences—and their First Amendment rights do not depend on ignoring audience preferences. *See Cinevision*, 745 F.2d at 568.

92. Even apart from interfering with Meta's own protected editorial judgments, the Act's personalized-feed ban also independently implicates the First Amendment because it regulates and restricts Meta's dissemination of third-party content. "[D]issemination of information [is] speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570. The "right of freedom of speech . . . embraces the right to distribute" speech, *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943), and to "promote protected expression" by others, *Cinevision*, 745 F.2d at 568. Thus, statutory

"restrict[ions on social media] platforms' ability . . . to disseminate speech to minors . . . implicate the First Amendment." *NetChoice v. Griffin* ("*Griffin II*"), 831 F. Supp. 3d 816, 832 (W.D. Ark. 2026).

93. As the Ninth Circuit has made clear, the First Amendment protects intermediaries who disseminate speech "even if they are not 'expressing' themselves" because they still "further a first amendment interest in making protected materials available to the public." *Cinevision*, 745 F.2d at 568. It "would be anomalous," for example, to "require a bookseller to read all of the books he plans to sell" before "any first amendment rights attach." *Id.* The activities of a "bookseller," "theater owner," and "concert promoter" are each protected because each serves as "a type of 'clearinghouse' for expression" by third parties. *Id.*; *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) (the First Amendment protects "affording the public access to discussion, debate, and the dissemination of information and ideas").

94. Meta's services function precisely as such "clearinghouse[s]" for third-party expression. *Cinevision*, 745 F.2d at 568. By prohibiting Meta from disseminating its feeds of third-party speech except as authorized by statute, AB 1709 burdens Meta's ability to disseminate speech and thus triggers First Amendment scrutiny. *See Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) ("Meta has a First Amendment right to use its platform to . . . convey posts").

95. "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to" minors. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975)). Those circumstances are not present here. The Act is not limited to constitutionally unprotected categories of speech, such as "obscenity for minors." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 494 (2025). Moreover, Meta prohibits obscenity on Facebook, Instagram, and Threads.

96. That the Act implements the personalized-feed ban both by a direct prohibition on providing this feature to minors, § 22683, and by requiring Meta to delete minors' accounts if the feature is not banned, § 22684(b), makes no constitutional difference. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan*, 497 U.S. at 77–78; *see also Sorrell*, 564 U.S. at 565–66 ("The distinction between laws burdening and laws banning speech is but a matter of degree." (quoting *United States v. Playboy Ent. Grp., Inc.*, 529

U.S. 803, 812 (2000))). Both provisions burden Meta's right to curate and organize the feeds of content on its services based on its editorial judgment as well as its right to disseminate protected third-party expression to minors.

97. AB 1709's personalized-feed ban is subject to strict scrutiny because it is content-based and speaker-based. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163–66 (2015); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994) ("*Turner I*").

98. *First*, the personalized-feed ban is content-based and speaker-based in a way that reflects an "aversion to what . . . disfavored speakers have to say." *Turner I*, 512 U.S. at 658. AB 1709 explicitly favors provider-generated content outside social media platforms—such as news articles, sports game results, or other website-authored materials—over content "generated or shared by users" on social media platforms. § 22682(b). Only feeds displaying the latter are subject to the ban. That makes this provision content-based and subject to strict scrutiny. *See, e.g.*, *Jones*, 822 F. Supp. 3d at 673 (strict scrutiny applies to law that "regulate[s] user-generated content, but not provider-selected content" because it is "content-based"); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1222 (N.D. Ga. 2025) (same), *vacated on other grounds and rev'd sub nom. NetChoice v. Att'y Gen., Ga.*, 2026 WL 3079563 (11th Cir. Oct. 15, 2026); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953–54 (S.D. Ohio 2025) (same), *rev'd on other grounds*, 180 F.4th 268 (6th Cir. 2026); *Reyes*, 748 F. Supp. 3d at 1121–23 (same).

99. *Second*, AB 1709's central coverage definition is content-based for two reasons. The statute exempts websites "limited to commercial transactions or to consumer reviews of products" from its novel regulatory constraints. § 22682(c)(2). Accordingly, by restricting feeds containing certain content while permitting feeds containing other content, the statute—including the personalized-feed ban—draws a content-based distinction. The ban is also facially content-based because it targets personalized content recommendations while leaving generically popular content recommendations untouched. A ban is content-based not only when it targets a specific topic—political or religious speech, for example—but also when it targets content bearing a particular quality. *See Iancu v. Brunetti*, 588 U.S. 388, 394 (2019) (bar on "immoral or scandalous" trademarks was content-based). Here, AB 1709 suppresses speech bearing a particular quality—content reflecting a user's individual interests, hobbies,

and goals—while doing nothing to regulate content that is widely popular among a generic majority of users. The First Amendment does not permit such selective suppression.

100. *Third*, the personalized-feed ban "cannot be justified without reference to" the "communicative content" of speech. *Reed*, 576 U.S. at 163–66. The State's own justifications rest upon "concern for [the] likely communicative impact" of Meta's feeds. *United States v. Eichman*, 496 U.S. 310, 317–18 (1990).

101. Tellingly, the Assembly Committee on Privacy and Consumer Protection's analysis identified two "primary risk factors" purportedly drawn from the U.S. Surgeon General's 2023 Advisory: (1) "harmful content," including "extreme, inappropriate, and harmful content" that "continues to be easily and widely accessible by children and adolescents" and is "spread through direct pushes, unwanted content exchanges, and algorithmic designs"; and (2) "excessive and problematic use" driven by engagement with that content.[67] Both categories are defined by the *communicative substance* of what minors view: the first is explicitly about content, and the second concerns the amount of time minors spend consuming it. Because the Legislature's justifications "stem from the direct communicative impact of speech," that means the statute "regulates speech on the basis of its content." *Tschida*, 924 F.3d at 1303.

102. The Surgeon General's report does not even reference personalized content recommendations as a possible cause of harm. In fact, the report does not reach a conclusive determination about the purported harms of social media more generally, noting instead that "[m]ore research is needed to fully understand the impact of social media" and that, "[a]t this time, we do not yet have enough evidence to determine if social media is sufficiently safe for children and adolescents."[68] To the extent the U.S. Surgeon General's report considered content personalization, it implied that personalization may be one of social media's benefits: "Social media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests."[69]

---

[67] Assemb. Comm. on Privacy & Consumer Prot., Analysis of AB 1709, 2025–2026 Leg., Reg. Sess., at 11–12 (Cal. Apr. 14, 2026).

[68] *See* Off. of the Surgeon Gen., *Social Media and Youth Mental Health* 4 (2023).

[69] Assemb. Comm. on Privacy & Consumer Prot., Analysis of AB 1709 ("Assembly Committee Analysis"), 2025–2026 Leg., Reg. Sess., at 6 (Cal. Apr. 14, 2026).

103. The other research the Legislature relied on makes this content-based motivation unmistakable, as it cited to:

a. a synthesis of 20 studies finding that viewing certain posts leads to "body dissatisfaction, disordered eating behaviors, and low self-esteem," Assembly Committee Analysis at 12;

b. the Surgeon General's statement that "live depictions of self-harm acts, like asphyxiation or cutting" can "normalize such behaviors," *id.* at 11;

c. a scoping review associating content to "body image concerns, disordered eating behaviors, clinical/subclinical eating disorders, and poor mental health";[70]

d. research associating "fear of missing out" generated by content—defined as "the pervasive apprehension that others might be having rewarding experiences from which one is absent"—with depression, anxiety, and neuroticism;[71] and

e. studies asserting that two-thirds of adolescents encounter "hate-based" content online.[72]

104. The Legislature's own record thus reveals that its justification is inextricable from the communicative impact of the speech some minors may encounter on some covered platforms. The studies it cited do not identify harms from content-neutral design features; they identify harms from minors *viewing, receiving, and being affected by* particular categories of speech—body-image comparisons, self-harm depictions, bullying, hate-based content, sexually explicit material, and algorithmically amplified "divisive content." That is the hallmark of a content-based justification. *See Reed*, 576 U.S. at 164 (a law is content-based if it "cannot be justified without reference to the content of the regulated speech" (citation omitted)); *Playboy*, 529 U.S. at 811 (recognizing that where "[t]he overriding justification for [a speech restriction] is concern for the effect of the subject matter on young viewers," the restriction must satisfy strict scrutiny (quotation omitted)); *Tschida*, 924 F.3d at 1303 ("Even a facially content-neutral law [is]

[70] S. Comm. on Privacy, Digital Techs., & Consumer Prot., Analysis of AB 1709, 2025–2026 Leg., Reg. Sess., at 7–8 (Cal. June 20, 2026).

[71] S. Comm. on Privacy, Digital Techs., & Consumer Prot., Analysis of AB 1709, 2025–2026 Leg., Reg. Sess., at 8–9 (Cal. June 20, 2026).

[72] Assemb. Comm. on Privacy & Consumer Prot., Analysis of AB 1709, 2025–2026 Leg., Reg. Sess., at 12 (Cal. Apr. 14, 2026).

considered content-based if it . . . is justified by a concern that stems from the direct communicative impact of speech," such as alleged harms from "the direct effect of th[e] speech on its listeners" (quotation omitted)).

105. In sum, the personalized-feed ban is content-based and speaker-based because it disfavors user-generated content on social media platforms; AB 1709's central coverage definition is facially content-based; and the ban cannot be justified without reference to the communicative content of the targeted speech. Any one of these features is enough to trigger strict scrutiny. Together, they demonstrate the clear need to apply that heightened standard of review.

106. A law survives strict scrutiny only if the government shows it "is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799. And even if strict scrutiny does not apply, a law burdening speech must at least survive intermediate scrutiny, such that it both "advances important governmental interests unrelated to the suppression of free speech" and "does not burden substantially more speech than necessary to further those interests." *Free Speech Coal.*, 606 U.S. at 471 (cleaned up).

107. The personalized-feed ban cannot survive intermediate scrutiny, much less strict scrutiny. "It has yet to be demonstrated how governmental regulation of [the editorial] process"—including the "choice of material to go into" a compilation—"can be exercised consistent with First Amendment guarantees." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

108. *First*, to survive any form of First Amendment review, an asserted governmental interest must be "unrelated to the suppression of free speech." *Free Speech Coal.*, 606 U.S. at 471. The State has identified no interest that is independent of suppressing speech. Quite the opposite: the central purpose of the personalized-feed ban is to alter, and ultimately limit, the speech presented to minors. The State maintains that feeds with personalized content recommendations contain content that harms minors, including by inducing them to spend too much time consuming speech. Although the protection of children is an important governmental interest—an interest that Meta shares, given the many safety tools it has developed for its teenage users—AB 1709 seeks to advance that interest only by restricting the nature and amount of speech that minors consume.

109. "It is well established that, as a general rule, the government 'may not suppress lawful speech as the means to suppress unlawful speech.'" *Packingham*, 582 U.S. at 109 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002)). AB 1709's personalized-feed ban does not even do that—instead, it aims to suppress lawful speech (feeds that include personalized content recommendations) in order to suppress other lawful speech (what the State characterizes as content leading to "compulsive use"). Again, the user-generated speech on Meta's services reflects "a wide array of protected First Amendment activity." *Id.* at 105. And the fact "[t]hat the State finds expression too persuasive"—or too attractive or engaging—"does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577–78.

110. *Second*, the State cannot demonstrate that the personalized-feed ban will materially "further [the State's asserted] interests." *Free Speech Coal.*, 606 U.S. at 471. The State must come forward with "substantial evidence" proving that personalized content recommendations on social-media feeds—not social media use in general—are the source of the problem that AB 1709 seeks to solve. *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) ("*Turner II*"). The State cannot carry that "demanding" burden. *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 865 (9th Cir. 2026).

111. *Third*, AB 1709's personalized-feed ban is not logically tailored to the harms the State seeks to address. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) ("Underinclusiveness can also reveal that a law does not actually advance a compelling interest."); *Brown*, 564 U.S. at 801–02 ("The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it."). To the extent the State believes that excessive use of online services can be problematic, the way to address that problem is by limiting time spent online—not by regulating only personalized content recommendations, while leaving minors free to spend as many hours as they want online. The Legislature's findings cite "peer-reviewed research," AB 1709 § 1(g), and invoke a "growing body of scientific research," § 1(i). But none of the research described by the Legislature establishes personalized content recommendations on social-media feeds in particular, as distinct from allegedly harmful content or online use more generally, as the source of any harm. Moreover, nearly all of the cited research "is based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800.

112. AB 1709 is also ineffective in that it preserves minors' access to the allegedly harmful features on other internet platforms. If the State were correct that making personalized content recommendations informed by users' data is inherently harmful no matter the content (it is not), then there would be no basis for exempting (1) all other sites providing personalized recommendations, such as music, television, and movie-streaming sites, *cf.* § 22682(c)(1) (regulating only sites with user-generated content); (2) sites whose personalized feeds are not "a significant part of the service provided by that [site]," § 22682(c)(1); or (3) sites facilitating commercial transactions or consumer reviews, § 22682(c)(2). Those exceptions undermine any claim that the personalized-feed ban directly addresses the harms the State asserts.

113. The personalized-feed ban also "burden[s] substantially more speech than necessary." *Free Speech Coal.*, 606 U.S. at 471. AB 1709 restricts feeds with personalized content recommendations for all minors across the board, regardless of whether individual minors are allegedly harmed by feeds with personalized content recommendations or whether they benefit from them, as the U.S. Surgeon General's report relied on by the Legislature indicates some minors do. The Ninth Circuit has "strongly suggested that the government does not have a broad and undifferentiated interest in shielding all minors from any non-obscene protected speech" deemed harmful. *Imperial Sovereign Ct. of Mont.*, 170 F.4th at 860. The ban is also overinclusive because it prohibits personalized content recommendations regardless of the minor's or even their parents' preferences and regardless of whether the service already voluntarily restricts minors' time spent. *See, e.g.*, *Brown*, 564 U.S. at 795 n.3 (disapproving of laws that "do not enforce *parental* authority over children's speech" but instead "impose *governmental* authority").

114. Numerous less restrictive alternatives are available. Meta already provides (or will soon provide) parental supervision tools, default two-hour time limits, nighttime restrictions, reminders, content controls, and settings through which parents and users may control how content is presented. And Meta will also soon provide an optional tool for parents and minors to turn off personalized content recommendations on the default feeds across both Facebook and Instagram. The State could encourage the adoption and use of such tools, educate the public about its views, or target unlawful conduct and unprotected speech, without categorically dictating how Meta curates and presents protected expression.

115. For these reasons, the personalized-feed ban unlawfully burdens Meta's First Amendment rights and will irreparably harm Meta and its users.

**COUNT TWO**
**42 U.S.C. § 1983; *Ex parte Young***
**As-Applied Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**
**(Ban on Autoplay, §§ 22682(a)(2), 22682(c), 22683, 22684(b))**

116. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

117. As applied to Facebook, Instagram, and Threads, the Act's prohibition against automatically playing user speech for minors is an unconstitutional regulation of protected First Amendment activity. §§ 22682(a)(2), 22683.

118. The videos of user-generated content on Meta's services are speech protected from government interference. *See Packingham*, 582 U.S. at 105 ("social media users employ [Meta's] websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." (quotation omitted)); *Imperial Sovereign Ct. of Mont.*, 170 F.4th at 846 ("[T]he Supreme Court and our court have recognized various forms of entertainment and visual expression as purely expressive activities, including music without words, dance, topless dancing, movies, parades with or without banners or written messages, and both paintings and their sale." (quotation omitted)).

119. Meta has a First Amendment right to disseminate and display this fully protected speech. The "right of freedom of speech . . . embraces the right to distribute" third parties' speech. *Martin*, 319 U.S. at 143; *see also, e.g.*, *Bellotti*, 435 U.S. at 783 (recognizing First Amendment right to engage in "the dissemination of information and ideas"); *Cinevision*, 745 F.2d at 568 (recognizing "a first amendment interest in making [third parties'] protected materials available to the public"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 688 (9th Cir. 2017) (en banc) ("Selling . . . [third parties'] books and other written materials is . . . *itself* expressive activity.").

120. This First Amendment right extends to the "*free and unhampered* distribution of" speech. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 154 (2002) (emphasis in original). The Supreme Court has, for example, consistently struck down on First

Amendment grounds government requirements to get a "permit" before engaging in "the dissemination of ideas." *Id.* (collecting cases).

121. The autoplay ban requires Meta to force users to take affirmative action before Meta can display fully protected audiovisual speech, and therefore burdens Meta's First Amendment right to engage in the free and unhampered distribution of speech. *See id.* at 167 ("requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech"); *see also, e.g.*, *Doe v. Harris*, 772 F.3d 563, 573 (9th Cir. 2014) ("a law requiring addressees of 'communist political propaganda' to request in writing that the mailing be delivered violate[s] . . . First Amendment rights because the law impose[s] an impermissible 'affirmative obligation' and [i]s 'almost certain to have a deterrent effect.'" (quoting *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965))).

122. The autoplay ban is therefore subject to First Amendment scrutiny because it imposes an "impermissible affirmative obligation," *Harris*, 772 F.3d at 573, that "would tend to restrict freedom to distribute information and thereby freedom of expression," *Teixeira*, 873 F.3d at 688 (cleaned up) (quoting *Talley v. California*, 362 U.S. 60, 64 (1960)); *see also, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 831 & n.16 (N.D. Cal. 2023) (restrictions on Meta's "auto-play" feature "would inherently limit what [Meta is] able to publish").

123. The autoplay ban independently implicates the First Amendment because it restricts Meta's First Amendment editorial and curatorial rights. Meta's feeds are shaped by Meta's "expressive choices" in deciding how to display particular user-generated content and thus receive First Amendment protection. *Moody*, 603 U.S. at 716 (a social media service's "choices about what third-party speech to display *and how to display it*" are protected by the First Amendment (emphasis added)). That protection has long extended beyond a publisher's "choice of material" to include decisions such as the "size" and "layout" of the material in a publication. *Tornillo*, 418 U.S. at 258. Whether to present audiovisual expression continuously or one item at a time is precisely such an editorial decision. Courts have accordingly applied *Moody* to claims targeting autoplay and similar features, recognizing that "[e]very method of displaying content involves editorial judgments regarding which content to display and where on the platforms." *Patterson v. Meta Platforms, Inc.*, 239 N.Y.S.3d 726, 733 (App. Div. 2025).

124. But the Act's autoplay ban would prohibit Meta from disseminating fully protected third-party "expression" beyond a State-sanctioned audience unless Meta complies with the State's editorial dictates about "*how* to display" expressive content—including its demand not to automatically play video or audio content on its expressive feeds. *Moody*, 603 U.S. at 716 (emphasis added). Because the autoplay ban burdens and restricts Meta from presenting "the third-party speech it wants in the way it wants" (including by accounting for users' interests and preferences about whether they want such content automatically played), it is for that reason too subject to and "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 718.

125. That the Act implements the autoplay ban both by a direct prohibition on providing this feature to minors, § 22683, and by requiring Meta to delete minors' accounts if the feature is not banned, § 22684(b), makes no constitutional difference. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan*, 497 U.S. at 77–78.

126. The autoplay ban is subject to strict scrutiny because it is content-based. *See Reed*, 576 U.S. at 163.

127. The Act singles out covered social media services while exempting other services that present comparable audiovisual expression, including services focused on commercial transactions, consumer reviews, cloud storage, and professionally produced content. Those distinctions permit favored speakers and services to present audiovisual expression automatically for minors while prohibiting Meta from doing the same. The Act thus treats materially similar methods of presenting speech differently depending on the identity of the publisher and the type of content the service disseminates.

128. Moreover, Meta is subject to the autoplay ban not because autoplay is a defining or significant feature of its services, but because Meta disseminates user-generated content on its feeds. The Act's coverage definition subjects Meta to regulation solely because its services display content "generated or shared by users." § 22682(c)(1). The autoplay ban thus operates as a content-based restriction: it is imposed on services like Meta's based on whether they disseminate user-generated content, which is a content-based distinction. *See, e.g.*, *Jones*, 822 F. Supp. 3d at 673. Services that automatically play video or animation but do not feature user-generated content—such as streaming

platforms, news websites, or e-commerce sites—may be exempt from the autoplay ban. *See* § 22682(c)(2). This distinction confirms that the autoplay ban targets speech based on its content and because the State disfavors user-generated content, triggering strict First Amendment scrutiny. *See Reed*, 576 U.S. at 163–66.

129. The autoplay ban is also subject to strict scrutiny because the State's justification for the ban is necessarily content-based. The legislative record does not identify any studies identifying harms specific to an autoplay feature itself; it instead contains only the same literature about purportedly harmful content discussed above. *See supra* ¶¶ 99–103. Moreover, the only justification the State could have for prohibiting the automatic playing of content is that it disfavors the underlying content and hopes to deter users from readily viewing it. *See Harris*, 772 F.3d at 573 (noting that law imposing a similar affirmative obligation to receive speech was "almost certain to have a deterrent effect" (quotation omitted)). The State cannot explain why playing content automatically would be harmful if the content were, for example, science experiments or math tutorials. A restriction justified by the asserted persuasive, immersive, or attention-retaining force of speech targets the communicative impact of that speech, and any justification for this prohibition is thus necessarily content-based.

130. Nor can the State avoid strict scrutiny by recasting its interest as reducing the time minors spend viewing content, rather than limiting access to the content itself. That interest does not explain (let alone justify) the statutory discrimination between user-generated content and provider-created content, and the State's inability to justify *that* distinction requires treating the provision as content-based. Nor does the interest justify the autoplay ban itself, which does not limit time spent at all, as it permits minors to view the same content indefinitely by pressing play. Moreover, an interest in limiting how long minors engage with user-generated expression because that expression is too engaging is an interest in suppressing the effect of speech on its audience, and the State's concern with time spent is inseparable from its concern with what minors are watching during that time. "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 578. There is no tradition of excluding purportedly "addictive" or overly engaging expression from the First Amendment's protection, even for minors. *See Brown*, 564 U.S. at 792, 797–98; *United States v. Stevens*, 559 U.S. 460, 472 (2010).

131. The autoplay ban cannot survive strict scrutiny—or even intermediate First Amendment scrutiny.

132. The autoplay ban is seriously overinclusive. "[I]mposing small burdens on vast quantities of speech for no appreciable benefit is not consistent with the First Amendment." *Griffin II*, 831 F. Supp. 3d at 833. The autoplay ban applies categorically to every user-generated video and animation presented to all minors, regardless of the amount of time the minor has been online, the underlying content, the duration, the context, the manner of use, the maturity of the user, and the user's or their parent's own preferences. The prohibition therefore reaches educational demonstrations, public service announcements, breaking news clips, artistic works, information about scholarships and public programs, civic speech, religious expression, health-related information, and supportive content, without any showing that allowing such expression to autoplay causes the harms asserted by the State. And it sweeps in services—like Facebook, Instagram, and Threads—that voluntarily engage in substantial content moderation efforts and provide supervisory tools for parents and guardians, and that will impose time limits on minors' daily use by default.

133. The autoplay ban is also seriously underinclusive. It allows minors to receive the same audiovisual expression after selecting a play button and permits comparable automatic presentation of audiovisual expression on exempt services. It also permits minors to spend unlimited time viewing the same content in other manners, including on other non-covered services and by their own clicks. Those exceptions undermine any contention that prohibiting autoplay directly and materially advances any legitimate state interest. If the same expression may be viewed indefinitely after one additional click or may autoplay on an exempt service, the Act's chosen distinction bears no adequate fit to its asserted objectives.

134. Numerous less restrictive alternatives are available. Meta already provides (or will soon provide) parental supervision tools, default two-hour time limits, nighttime restrictions, reminders, content controls, and settings through which parents and users may control how content is presented. And Meta, in the coming months, will provide an optional tool for parents and minors to restrict or turn off the automatic playing of video content. The State could encourage the adoption and use of such tools, educate

the public about its views, or target unlawful conduct and unprotected speech, without categorically dictating how Meta displays audiovisual expression.

135. For these reasons, unless declared invalid and enjoined as applied to Meta's services, the Act's autoplay ban will unlawfully burden the First Amendment rights of Meta and its users and will irreparably harm Meta and its users.

**COUNT THREE**
**42 U.S.C. § 1983; *Ex parte Young***
**Federal Statutory Preemption Under 47 U.S.C. § 230**
**(Ban on Personalized Feeds, §§ 22682(a)(1), 22683, 22684(b))**

136. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

137. As applied to Meta's Facebook, Instagram, and Threads services, the Act's personalized-feed ban is also inconsistent with, and therefore preempted by, Section 230 of the Communications Decency Act.

138. Congress enacted Section 230 "to promote the free exchange of information and ideas over the Internet," *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003), and "to preserve the vibrant and competitive free market that presently exists for the Internet or other interactive computer services, unfettered by . . . State regulation," 47 U.S.C. § 230(b)(2). To that end, Section 230 shields websites and internet services from liability for user-generated speech on their websites or services: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

139. Section 230 also expressly preempts and bars enforcement of state laws that are inconsistent with Section 230's provisions. The statute is explicit: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). Courts accordingly enjoin the enforcement of state and local laws inconsistent with Section 230's protections. *See, e.g.*, *Bonta*, 790 F. Supp. 3d at 809 (granting preliminary injunction of California law imposing on online platforms an obligation to "monitor listings to affirmatively prevent and detect organized retail crime" in violation of Section 230); *CCIA v. Paxton*, 184 F.4th 420, 442 (5th Cir. 2026) (affirming preliminary injunction in pre-enforcement challenge to a statute imposing

"monitoring and filtering requirement" on social media websites as "squarely preempted by Section 230"); *Greater Las Vegas Short-Term Rental Ass'n v. Clark Cnty.*, 799 F. Supp. 3d 1133 (D. Nev. 2025) (granting preliminary injunction in affirmative challenge to county ordinance imposing verification, monitoring, and removal obligations on online platforms as preempted by Section 230); *cf. HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019) (recognizing Section 230's preemptive force in affirmative challenge to city ordinance but affirming denial of preliminary injunction after finding no conflict between the ordinance and Section 230).

140. The Ninth Circuit has recognized that Section 230 is "extraordinarily powerful," and "preempt[s] [the enactments of] state legislatures" to the extent a state law intrudes on the protection it provides. *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1435 (2025); *see also HomeAway.com*, 918 F.3d at 681 (emphasizing that Section 230 "explicitly preempts inconsistent state laws" (citing 47 U.S.C. § 230(e)(3))).

141. Section 230 preempts state laws if, in an enforcement action under the law, Meta would be "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009) (citing 47 U.S.C. § 230(c)(1)). All three elements are satisfied here.

142. Part one of the Section 230(c)(1) test is satisfied because Meta is an "interactive computer service" provider under 47 U.S.C. § 230(f)(2). *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024) ("Meta is an interactive computer service provider under the statute."); *Doe 1 v. Meta*, 174 F.4th at 1167 ("Meta [i]s the provider of an interactive computer service").

143. Parts two and three of the Section 230(c)(1) test are satisfied because the personalized-feed ban "attack[s] the manner in which Facebook's [and Instagram's and Threads'] algorithm sorts, arranges, and distributes third-party content." *Doe 1 v. Twitter*, 148 F.4th at 646 (quotation omitted); *see also, e.g.*, *Doe 1 v. Meta*, 174 F.4th at 1169–70 (Section 230 bars claims that would impose liability on Meta based on "Facebook's promotion of engagement-driven [third-party] content through [a] recommendation algorithm," including "a personalized algorithm").

144. Specifically, the personalized-feed ban threatens Meta with liability if it makes personalized recommendations of "media generated or shared by users" of Meta's services. § 22682(b). An Instagram, Threads, or "Facebook user constitutes 'another information content provider' for purposes of Section 230." *Karam v. Meta Platforms, Inc.*, 2025 WL 3079048, at *2 (N.D. Cal. Nov. 4, 2025) (quoting *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020)). And to comply with the personalized-feed ban, Meta must alter its decisions regarding how to "recommend[], select[], or prioritiz[e] for display" that "media generated or shared by users." § 22682(b).

145. Publishing decisions protected by Section 230 include "the manner in which [a social media company's] algorithm sorts, arranges, and distributes third-party content." *Doe 1 v. Twitter*, 148 F.4th at 646 (quoting *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 521, 523–27 (4th Cir. 2025)). Put otherwise, "algorithms that provide users with suggestions of some third-party posts over others constitute publishing conduct" and claims predicated on such conduct are "barred by Section 230." *Doe 1 v. Meta*, 174 F.4th at 1168; *see also id.* at 1169 ("algorithmic content delivery and 'recommending' content is 'meant to facilitate the communication and content of others' and is thus a form of publisher conduct" under Section 230); *Dyroff*, 934 F.3d at 1098 (recommendation algorithms "are tools meant to facilitate the communication and content of others" and "not content in and of themselves"); *Doe v. Webgroup*, 2026 WL 2334146, at *1 (9th Cir. Aug. 12, 2026) (a "recommendation algorithm" is a content-neutral publishing "tool[]" protected by Section 230).

146. Section 230 therefore preempts any claim against Meta under the personalized-feed ban because that ban "touches on . . . publishing conduct." *Calise*, 103 F.4th at 744 (holding that Section 230 preempted claim under California statute). "Meta created Facebook," Instagram, and Threads, and how those services "recommend content to users"—including through "a personalized algorithm that use[s] machine learning to pick up on users' preferences and attributes"—"is publishing conduct that does not materially contribute to or develop the underlying content" and is protected by Section 230. *Doe 1 v. Meta*, 174 F.4th at 1170.

147. Because the personalized-feed ban constitutes a "State or local law that is inconsistent with" Section 230, it is preempted by federal law and any attempt to enforce it would be unlawful. 47 U.S.C. § 230(e)(3).

**COUNT FOUR**

**42 U.S.C. § 1983; *Ex parte Young***
**Federal Statutory Preemption Under 47 U.S.C. § 230**
**(Ban on Autoplay, §§ 22682(a)(2), 22683, 22684(b))**

148. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

149. As applied to Meta's Facebook, Instagram, and Threads services, AB 1709's autoplay ban is inconsistent with, and therefore preempted by, Section 230 of the Communications Decency Act.

150. Section 230 preempts state laws that would "hold internet content providers liable for developing 'content-neutral tools used to facilitate [users'] communications.'" *Doe 1 v. Twitter*, 148 F.4th at 646 (quoting *Dyroff*, 934 F.3d at 1096). The autoplay ban does just that. It threatens Meta with liability if Meta automatically plays users' content to other users and thereby facilitates user-to-user communication. *See In re Soc. Media*, 702 F. Supp. 3d at 831 & n.16 (holding that Meta's "auto-play" feature is protected by Section 230 because it is used "to publish . . . third-party content").

151. Publishing decisions protected by Section 230 include "the manner in which [a social media company] sorts, *arranges, and distributes* third-party content." *Doe 1 v. Twitter*, 148 F.4th at 646 (emphasis added) (quotation omitted). Like recommendation algorithms, automatically playing media is a method of "distribut[ing] third-party content" on a social media platform—a classic publisher function. *Id.*; *see also, e.g.*, *Divino Grp. LLC v. Google LLC*, 2022 WL 4625076, at *17 (N.D. Cal. Sept. 30, 2022) (Section 230 extends to features that "display others' content" (quoting *Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019) (cleaned up))); *Wozniak v. YouTube, LLC*, 100 Cal. App. 5th 893, 918 (2024) (Section 230 extends to a website's decision to "supply[] neutral tools that deliver content in response to user inputs" (citing *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) (en banc))).

152. Because the autoplay ban constitutes a "State or local law that is inconsistent with" Section 230, it is preempted by federal law and any attempt to enforce it would be unlawful. 47 U.S.C. § 230(e)(3).

**<u>COUNT FIVE</u>**
**42 U.S.C. § 1983; *Ex parte Young***
**Federal Statutory Preemption Under 47 U.S.C. § 230**
**(Account-Deletion Requirement, § 22684(b))**

153. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

154. As applied to Meta's Facebook, Instagram, and Threads services, AB 1709's account-deletion requirement is inconsistent with, and therefore preempted by, Section 230 of the Communications Decency Act.

155. The Act's mandate that Meta "shall delete" certain user-created accounts, § 22684(b); *see* § 22682(f) (defining "user" as a person who "create[s] an account on a covered platform"), is inconsistent with Section 230. "[A] claim [that] turns on a defendant's . . . conduct of publishing . . . is barred under Section 230." *Doe 1 v. Meta*, 174 F.4th at 1167 (quotation omitted). And "[b]ecause removing content is something publishers do, imposing liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Calise*, 103 F.4th at 740 (cleaned up) (quoting *Barnes*, 570 F.3d at 1103).

156. Accordingly, courts have recognized that Section 230 preempts claims and California statutes that would hold Meta liable for decisions about whether to delete user accounts, which are a form of user-generated content. *See Shared P'ship v. Meta Platforms, Inc.*, ___ F.4th ___, 2026 WL 3266791, at *1, *4–5 (9th Cir. 2026) (Section 230 foreclosed claims arising from Meta's cancellation of plaintiff's Facebook account because Meta "acted like a prototypical publisher when it" did so); *Bonta*, 790 F. Supp. 3d at 809 (Section 230 preempted California statutory requirement to delete certain user accounts); *see also, e.g.*, *Fyk*, 808 F. App'x at 598 ("Facebook is . . . entitled to § 230(c)(1) immunity [for] allegedly de-publishing pages . . . and then re-publishing them."); *Tate v. Meta Platforms Inc.*, 2026 WL 1146745, at *2 (N.D. Cal. Apr. 28, 2026) (dismissing lawsuit "predicated on Meta's termination of [individual users'] accounts" under Section 230); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020) (similar); *King v. Facebook, Inc.*, 2021 WL 5279823, at *13 (N.D. Cal. Nov. 12, 2021) (similar).

157. Because AB 1709's account-deletion requirement constitutes a "State or local law that is inconsistent with" Section 230, it is preempted by federal law and any attempt to enforce it would be unlawful. 47 U.S.C. § 230(e)(3).

**PRAYER FOR RELIEF**

Meta requests an order and judgment:

1. Declaring that Cal. Bus. & Prof. Code §§ 22682(a)(1)–(2), 22682(c), 22683, and 22684(b) are unlawful as applied to Meta's Facebook, Instagram, and Threads services;
2. Declaring that Cal. Bus. & Prof. Code §§ 22682(a)(1)–(2), 22682(c), 22683, and 22684(b), as applied to Meta's Facebook, Instagram, and Threads services, violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;
3. Declaring that §§ 22682(a)(1)–(2), 22683, and 22684(b), as applied to Meta's Facebook, Instagram, and Threads services, are preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230;
4. Preliminarily, and then permanently, enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Meta;
5. Entering judgment in favor of Meta;
6. Awarding Meta its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and
7. Awarding Meta all other such relief as the Court deems just and proper.

DATED: November 4, 2026

Respectfully submitted,

By: */s/ Isaac D. Chaput*

Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Jeffrey E. Sandberg (pro hac vice forthcoming)
Kuntal V. Cholera (pro hac vice forthcoming)
Alexandra J. Widas (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
jsandberg@cov.com
kcholera@cov.com
awidas@cov.com

Charlotte S. Butash (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
30 Hudson Yards
New York, New York 10001
(212) 841-1000
cbutash@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*